J-A29007-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: N.R.M., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M.H., FATHER | : : : : : : : | |
| | : | No. 968 WDA 2025 |

Appeal from the Order Entered July 3, 2025
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000027-2025

BEFORE: OLSON, J., DUBOW, J., and BENDER, P.J.E.

MEMORANDUM BY DUBOW, J.:         **FILED: December 15, 2025**

    M.H. ("Father") appeals from the July 3, 2025 order entered in the Allegheny County Court of Common Pleas in which the trial court terminated his parental rights to N.R.M. ("Child") born in 2023.[1]  After careful review, we affirm.

    The Office of Children Youth and Families of Allegheny County ("the Agency") has been involved with Father and his children since 2008 and the court has involuntarily terminated Father's parental rights to his five other children.  Father is diagnosed with an intellectual disability and has a history of substance abuse and intimate partner violence ("IPV").

    The Agency obtained emergency custody of Child at birth because Mother did not want to hold or care for the baby at the hospital.  Mother told

---

[1] Child's mother is M.E. ("Mother").  Mother did not contest the termination of her parental rights and is not a party to this appeal.

the Agency that she was only acting as a surrogate for Father and his new paramour and that she did not want the baby. Mother also informed the Agency that Father had changed his mind about wanting to take the baby. The Agency placed Child in a pre-adoptive foster home with F.P. ("Foster Father") and H.P. ("Foster Mother") (collectively, "Foster Parents") where he remains. Child's biological sister, N.B., also resides with Foster Parents.

On August 16, 2023, the trial court adjudicated Child dependent. At the time of the adjudication, Father's goals were to undergo psychological evaluation, attend coached visitation, continue his mental health treatment, and participate in IPV counseling.

At Father's permanency review hearings, the trial court found Father in moderate compliance with his goals. Father completed IPV counseling and maintained housing. Father consistently and frequently attended supervised visits with Child and worked with a visit coach on a parenting curriculum and coached visitation. The Agency made referrals to the Office of Disability Support and to Mercy Behavioral Health's intellectual disability program, but Father declined to work with either service. Father's only mental health treatment consisted of participating in a monthly therapy session to address his anxiety.

Child has significant medical and developmental issues that have required services from cardiology, neurology, urology, endocrinology, gastroenterology, and genetics. Child receives physical, occupational, vision, and speech therapy weekly and developmental therapy bi-weekly, and sees a

nutritionist once a month. Father has attended only 12 of the 77 medical appointments since Child's placement in foster care.

On May 4, 2025, the Agency filed a petition to terminate Father's parental rights. The court appointed KidsVoice to serve as both Child's legal counsel and guardian *ad litem* after finding that the dual role did not pose a conflict. On June 27, 2025, the trial court held a contested termination of parental rights hearing. The Agency presented testimony from Dr. Terry O'Hara, psychologist; Foster Mother; Joe Rawson, assistant director of parenting support at Achieva[2]; and Myia Weisend, caseworker. Father presented testimony from Scott Miller, a case aide. Father also testified on his own behalf.

The Agency's witnesses testified in accordance with the above-stated facts. In addition, Dr. O'Hara, an expert witness, testified that he had performed three evaluations of Father. He testified that Father lacks insight into why Child was removed from his care, does not have motivation to make substantial change, and externalizes all responsibility for his circumstances. Dr. O'Hara testified that Father would need to "make progress in order to position himself to provide minimally adequate parenting." N.T. Hr'g, 6/27/25, at 13. He recommended that Father undergo a neuropsychological evaluation for his history of head trauma and participate in parenting support tailored to intellectual disabilities, and further recommended a referral to the

---

[2] Achieva is an organization that provides programs and activities for individuals with intellectual disabilities.

Office of Intellectual Disabilities. Dr. O'Hara testified that Father "did not appear to have an understanding of [Child's] developmental concerns [or] medical needs," and, as a result, may not be able to follow through with prioritizing Child's medical services. *Id.* at 16.

Dr. O'Hara also testified to Father's relationship with Child. He testified that Father does well with Child and shows positive parenting skills. He testified that Child has a bond with Father and there would be some detriment to Child if the relationship were terminated, but that "there is mitigation of potential detriment given the stability that [Child] has with [Foster Parents and biological sister] and the level of safety and security and stability in this household." *Id.* at 22-23. Dr. O'Hara testified that Foster Parents have a strong and secure relationship with Child, understand Child's medical and developmental needs, and appear to be appropriate adoptive resources.

Foster Mother testified to her care for Child, who is diagnosed with global delays. She outlined the extensive early intervention and medical services that Child receives. Foster Mother testified that Father has not participated in any of Child's early intervention services. She testified that on one occasion in April 2024, Father attended Child's medical appointment and was instructed to call and schedule an emergency electroencephalography ("EEG") for Child. When the Agency followed up a few days later, Father reported that he had not scheduled the procedure. Eventually, Foster Mother had to schedule the EEG herself. Foster Mother described Child as "a ball of fire[,] outgoing,

adventurous, loveable, just like happy[.]" *Id.* at 38. She testified that she is an adoptive resource for Child.

Mr. Rawson testified that Father consistently attends his visits with Achieva and Child "responds very favorably" to Father. *Id.* at 57. Ms. Weisend testified that Father was never able to obtain unsupervised visits with Child. She explained that although caseworkers provided Father with the details of Child's medical appointments via a printed list, texts, and emails to Father's counsel, Father nevertheless consistently failed to attend Child's medical appointments. She testified that although Father complained that he did not have transportation to the appointments, the Agency had provided him with bus passes and tickets. Ms. Weisend further testified that Father does not understand the extent of Child's special needs and thinks he is just "a little bit delayed" and "clumsy." *Id.* at 98.

On July 3, 2025, the trial court terminated Father's parental rights to Child.

Father timely appealed. Father and the trial court complied with Pa.R.A.P. 1925.

Father raises the following issues for our review:

1. Did the trial court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Father's paternal rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), and (8)?

2. Did the trial court abuse its discretion and/or err as a matter of law in concluding that [the Agency] met its burden of proving by clear and convincing evidence that termination of Father's

parental rights would best serve the needs and welfare of [Child] pursuant to 23 Pa.C.S. § 2511(b)?

Father's Br. at 6.

In cases involving the involuntary termination of parental rights, this Court's review is limited to determining whether the trial court's conclusion is supported by competent evidence. *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021). When we review a trial court's decision to grant or deny a petition to involuntarily terminate parental rights, we must accept the findings of fact and credibility determinations of the trial court if the record supports them. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* (citation omitted).

"Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (citation omitted). We may not reverse merely because the record could support a different result. *T.S.M.*, 71 A.3d at 267. We give great deference to the trial courts "that often have first-hand observations of the parties spanning multiple hearings." *Id.* Moreover, "[t]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).

It is axiomatic that "[p]arents enjoy a fundamental right to make decisions regarding the care, custody and control of their children. It cannot

- 6 -

be denied that significant and permanent consequences for both the parent and child can follow the termination of parental rights, as there is an undeniable importance in a child's relationship with a biological parent." *L.A.K.*, 265 A.3d at 591 (internal citations omitted). Accordingly, "[i]n recognition of the gravity attendant to the termination of parental rights, the moving party must establish the statutory grounds by clear and convincing evidence; that is, evidence that is so clear, direct, weighty and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* at 592 (citations and quotation marks omitted).

Section 2511 of the Adoption Act, 23 Pa.C.S. § 2511, governs termination of parental rights, and requires a bifurcated analysis. "Initially, the focus is on the conduct of the parent." *In re Adoption of A.C.*, 162 A.3d 1123, 1128 (Pa. Super. 2017) (citation omitted). As discussed above, "[t]he party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a)." *Id.* (citation omitted). If the court determines that the parent's conduct warrants termination of his or her parental rights, the court then engages in "the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." *Id.* (citation omitted). Notably, we need only agree with the court's decision as to any one subsection of Section 2511(a), as well

as Section 2511(b), to affirm the termination of parental rights. *In re K.Z.S.*, 946 A.2d 753, 758 (Pa. Super. 2008).

With regard to Father, we concentrate our analysis on Section 2511(a)(2). Section 2511(a)(2) provides for termination of parental rights where the petitioner demonstrates by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." 23 Pa.C.S. § 2511(a)(2); *see In re Adoption of S.P.*, 47 A.3d 817, 827 (Pa. 2012).

The grounds for termination of parental rights under Section 2511(a)(2) due to parental incapacity are not limited to affirmative misconduct; those grounds may also include "acts of refusal as well as incapacity to perform parental duties." *In re N.A.M.*, 33 A.3d 95, 100 (Pa. Super. 2011) (citing *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (overruled on other grounds)). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *In re C.M.K.*, 203 A.3d 258, 262 (Pa. Super. 2019).

Sincere efforts to perform parental duties may still be insufficient to remedy an incapacity. *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010). This is because subsection (a)(2) "emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his

- 8 -

physical or mental well-being[,]" especially "where disruption of the family has already occurred and there is no reasonable prospect for reuniting it." *Id.* (citation omitted).

Father asserts that the Agency failed to provide sufficient evidence to terminate his parental rights pursuant to Section 2511(a)(2). Father's Br. at 18-20. Father argues that he "has remedied the conditions that led to the removal of [Child] as a result of his participation in [] treatment programs and classes." *Id.* at 19. He highlights his participation in therapy, IPV counseling, and parenting programs. *Id.* He further asserts that "[t]estimony reflected that Father was able to take the skills he learned in his parenting programs and apply them to his parenting of [Child]" and that Father "was able to provide essential parental care to [Child.]" *Id.*

In its opinion, the trial court emphasized that Father failed to take steps to engage with services designed to address his limited intellectual capacity:

> Father has a significant history with the court system and [the Agency]. . . . As with his previous children, the greatest barrier for Father has been his limited intellectual capacity. Deficits such as his often interfere with a parent's ability to make progress on their goals and their ability to independently parent their children. The Court has found that parents who have these limitations must work with a myriad of services and have a solid support system to successfully reunify with their children. [The Agency] has the ability to connect parents with these services, but the onus is on the parent to meaningfully engage. In this case, the [Agency] caseworker made referrals for Father to the Office of Disability Support and to Mercy Behavioral Health's intellectual disability program. . . . But Father declined to work with either service. The only treatment that he participated with was a monthly therapy session to address his anxiety. This treatment was woefully inadequate to address Father's mental health needs.

Trial Ct. Op., 8/28/25, at 33-34.

The court also acknowledged that Father visited Child consistently and frequently and developed a bond with his son. *Id.* at 34. However, the court nevertheless found that Father's "intellectual deficits have impacted his ability to father safely and independently[,]" opining that:

> While Father can change a diaper and offer [Child] a snack, he does not possess the ability to parent full time. [Child] has significant medical and developmental issues. . . . [Child] has attended 77 medical appointments since being placed in foster care. Father has only attended 12 of them. In addition, [Child's] medical concerns could be life-threatening if left untreated or not treated in an expeditious manner. . . . Father largely relies on others to assist with most everything in his life. He has never been the primary caregiver for his children and has struggled to understand his child's developmental and medical needs. Father does not attend any of [Child's] therapeutic appointments nor does he fully grasp all his son's therapeutic needs.

*Id.* at 34-35(internal citations omitted).

Our review of the record supports the trial court's findings, and we decline to usurp the trial court's credibility determinations or reweigh the evidence. Significantly, Father does not appear to understand the severity of his Child's medical and therapeutic needs and is unable to provide the level of care necessary to address Child's significant developmental issues. Moreover, despite receiving referrals from the Agency, Father has failed to meaningfully engage with mental health services designed to assist individuals with limited intellectual capacity, instead choosing only to attend monthly therapy sessions to address his social anxiety. Accordingly, we find no abuse of discretion in the trial court's conclusion that Father does not have the capacity to provide

proper and essential parental care and control for Child and cannot or will not remedy this incapacity.

With respect to Section 2511(b), our analysis focuses on the effect that terminating the parental bond will have on the child. This Court reviews "whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010). It is well settled that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005).

"One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond" that the child has with the parent, "with close attention paid to the effect on the child of permanently severing any such bond." *In re Adoption of N.N.H.*, 197 A.3d 777, 783 (Pa Super. 2018) (citation omitted). The fact that a child has a bond with a parent does not preclude the termination of parental rights. *In re A.D.*, 93 A.3d 888, 897 (Pa. Super. 2014). Rather, the trial court must examine the depth of the bond to determine whether the bond is so meaningful to the child that its termination would destroy an existing, necessary, and beneficial relationship. *Id.* at 898. Moreover, the trial court should "consider the intangibles, such as the love, comfort, security, and stability the child might have" with the adoptive resource. *N.A.M.*, 33 A.3d at 103. Ultimately, the concern is the needs and welfare of the child. *Z.P.*, 994 A.2d at 1121.

- 11 -

Father argues that the trial court erred in terminating his parental rights under Section 2511(b), pointing to witness testimony that Father and Child had positive interactions and testimony from Dr. O'Hara that "[Child] was securely attached to Father and Father and [Child] were bonded." Father's Br. at 22 (citing N.T. Hr'g at 17, 31). He also highlights Dr. O'Hara's testimony that "[i]f Father's parental rights were terminated and [Child] were to no longer have any contact with [Father, Child] would suffer a detriment and a negative effect." *Id.* (citing N.T. Hr'g at 22, 31).

The trial court concluded that it was in Child's best interest to terminate Father's parental rights under Section 2511(b). The trial court acknowledged "that there is a bond between the [Child] and Father" but found that "it is not a necessary bond [as a]ny detriment caused from a cessation of the relationship could be addressed by the foster parents and in a therapeutic setting if necessary." Trial Ct. Op. at 35. The trial court further found that Child had a secure attachment to his foster family, opining that:

> [T]he bond between [Child] and his Foster Parents [is] a necessary and beneficial one. [Child] views them as his psychological parents and seeks them out for comfort and care. He has been in their care since birth and [Foster Parents] have done an incredible job ensuring that all his medical needs have been met. Dr. O'Hara also observed [Child] with [Foster Parents], noting that they have strong parenting skills and have presented the child with stability. [Child] is placed with his older sibling in the foster home and he is extremely bonded with her. The Foster Parents have provided the child with stability and have been meeting all his needs.

*Id.*

- 12 -

Our review of the record supports the trial court's findings. While Child and Father are bonded, it is nevertheless in the Child's best interests to terminate that bond, as Dr. O'Hara's expert testimony supports the trial court's finding that any detriment can be addressed by the stability and care provided by Foster Parents.

In conclusion, we discern no error of law or abuse of discretion with respect to the trial court's conclusion that the Agency presented clear and convincing evidence to terminate Father's parental rights pursuant to Section 2511(a)(2) and (b). In light of our disposition, we decline to address Father's arguments as they relate to other subsections of Section 2511.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 12/15/2025